**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | | |
|---|---|---|
| In re | | Case No. 24-50346 |
| Fast Flow Plumbing, LLC | ) | Chapter 11 Subchapter V |
| Debtor | ) | Small Business Case |
| | ) | Hon. Gregory R. Schaaf |
| | ) | United State Bankruptcy Judge |
| | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING DEBTOR'S SUBCHAPTER V SMALL BUSINESS PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

This matter came before the court to consider the confirmation of Debtor's Chapter 11 Subchapter V Plan of Reorganization dated December 10, 2024. [ECF No. 247]. Debtor having been unable to achieve a consensus among the holders of claims classified under the Plan, and Debtor having requested confirmation under §1191(b); the Court having considered the evidence in the record and the various agreements between the parties; and the Court being otherwise sufficiently advised, hereby finds, concludes and orders as follows:

**FINDINGS OF FACT**

**A. Procedural History**

1. On March 26, 2024, Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code. Debtor is a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

2. The Debtor's principal location of business is 390 Bluesky Parkway, Lexington KY 40509, and venue in the Eastern District of Kentucky was proper as of the petition date and continues to be proper under 28 U.S.C. § 1408.

3. On June 24, 2024, Debtor filed a Subchapter V Small Business Plan of Reorganization, pursuant to 11 U.S.C. § 1189 [ECF No. 139].

4. Debtor amended the plan on August 21, 2024, [ECF No 185], on September 11, 2024 [ECF 201]; and again, on October 22, 2024, [ECF 232].

5. On November 18, 2024, Debtor submitted Summary of the Results of Voting on the Plan [ECF No. 239], which reported that an insufficient number of votes were cast to achieve a consensual confirmation of the Debtor's Plan.

6. A final hearing on confirmation was held on November 21, 2024. All objections to the plan were resolved on the record or before the hearing.

7. The Court granted confirmation under §1191(b) on the record. [ECF No. 244].

8. On December 11, 2024, Debtor filed a final version of its Chapter 11 Subchapter V Plan of Reorganization, (the "Plan"), which removed all references to a consensual confirmation under 11 U.S.C § 1191(a), incorporated the terms and conditions of various orders and agreements related to objections to the Plan. [ECF No. 247, the "Plan"].

9. The Plan is incorporated by reference and affixed hereto as <u>Exhibit A</u>. Unless otherwise stated, capitalized terms shall have the meaning ascribed to them in the Plan.

**B. Voting.**

Votes to accept and reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. The Summary of the Results of Voting on the Plan [ECF No. 239] shows that the Plan was rejected by creditors entitled to vote to accept or to reject the Plan.

**C. <u>Compliance with the Elements of 11 U.S.C. § 1129(a).</u>**

**(1) Compliance of the Plan with Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**

The Court has reviewed the Plan and its contents and finds that it complies with all applicable provisions of the Bankruptcy Code as required by 11 U.S.C. § 1129(a)(1), including the applicable elements and requirements of 11 U.S.C. §§ 1122 and 1123.

**(2) The Debtor Complies with Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**

The record reflects that the Debtor solicited acceptances of the Plan in good faith and in accordance with the requirements of 11 U.S.C. § 1125 and Bankruptcy Rule 3017. The ballots were solicited and tabulated in a fair and proper manner and in accordance with Bankruptcy Rules 3017, 3018 and 3019, and 11 U.S.C. § 1126(b). Thus, the Debtor has complied with 11 U.S.C. § 1129(a)(2).

**(3) Proposal of the Plan in Good Faith (11 U.S.C. § 1129(a)(3)).**

The record shows that Debtor proposed the Plan in good faith and not by any means forbidden by law, and no party has asserted otherwise. The Plan therefore complies with 11 U.S.C. § 1129(a)(3).

**(4) Bankruptcy Court Approval of Certain Professional Payments as Reasonable (11 U.S.C. § 1129(a)(4)).**

Under the Plan, allowed administrative claims shall be paid in full upon the Effective Date of the Plan, or as otherwise agreed to by such claimants. The Plan furthermore sets forth a total amount of administrative claims and expenses that Debtor estimates will be incurred over the duration of the Plan, which is to be paid subject to the Court's approval. The Plan furthermore provides that any recoveries realized by the Debtor through compromises or litigation shall be transferred to the Disbursement Agent and preserved for the benefit of the estate. Thus, the Plan complies with 11 U.S.C. § 1129(a)(4).

**(5) Disclosure of Identity and Affiliations of Proposed Management (11 U.S.C. § 1129(a)(5)).**

The Plan identifies the composition of the Debtor's post-confirmation management. The reorganized debtor will be managed by insider Donald Fitzpatrick and CEO Jennifer Hurst under the supervision and control of Michael E. Wheatley who, upon confirmation shall be appointed as the trustee in possession (the "TIP"). The TIP. shall be responsible and have the authority to take any actions desirable or necessary in his business judgment to continue the post-confirmation operations of the Debtor in conformity with the Plan. The TIP shall also have the authority to take any and all actions desirable or necessary, in his business judgment, to oversee the implementation of the Plan. Thus, the Plan complies with 11 U.S.C. § 1129(a)(5).

**(6) Approval of Rate Changes (11 U.S.C. § 1129(a)(6))**

The Plan does not involve the establishment of rates controlled by any regulatory commission; therefore, 11 U.S.C. § 1129(a)(6) is not applicable herein.

**(7) Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**

With respect to each impaired class of claims or interests, the Court finds that the record verifies that each holder of a claim will receive or retain under the Plan on account of such claim property of a value, as of the Effective Date, that is not less than the amount that the holder of the Claim would receive or retain if the Debtor were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code. Thus, the Plan complies with 11 U.S.C. § 1129(a)(7).

**(8) Acceptance of the Plan by Each Impaired Class (11 U.S.C. § 1129(a)(8)).**

The Plan consists of 16 classes that are impaired, five of which voted on the Plan. Of the five voting classes three classes voted to accept the Plan, and two classes voted to reject the plan. Pursuant to 11 U.S.C. § 1191(b), the requirement that each holder of a claim vote to accept a plan of reorganization (U.S.C. §§ 1129(a)(8)) is not applicable under Subchapter V, so long as the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under the plan and has not accepted the plan. As discussed below, all classes of claims impaired under the Plan have been treated in accordance with the relevant provisions of the Code.

**(9) Proper Treatment of Claims Entitled to Priority (11 U.S.C. § 1129(a)(9)).**

Pursuant to 11 U.S.C. § 1129(a)(9), the Plan properly provides for the payment of all claims entitled to priority under 11 U.S.C. § 507, including administrative claims, priority claims, and any tax claims, and that the Plan complies with 11 U.S.C. § 1129(a)(9). Specifically, Debtor and the Internal Revenue Service have agreed that: (a) by not later than the Effective Date, Debtor shall file all missing tax returns with the IRS; (b) upon the processing of the missing tax returns, the IRS shall amend its proof of claim and file a request for payment of administrative expenses accordingly; (c)  on or before 30 days after the IRS filing its amended proof of claim and/or request for payment of administrative expenses, Debtor shall

pay any balance of post-petition taxes that remain due and owing directly to the IRS in one lump sum; (d) any balance remaining on account of pre-petition tax obligations entitled to priority treatment under §507(a)(8) shall be paid in equal quarterly cash payments within five years after the date of the entry of the order for relief, with such payments to be administered in accordance with Article V of the Plan; (e) any general unsecured claims owed to the IRS shall be treated in accordance with the treatment afforded to Class 6 Claimants as set forth in Section 4.06 of the Plan. [See ECF No. 245].

**(10)     Acceptance by at Least One Impaired Class. (11 U.S.C. § 1129(a)(10)).**

Pursuant to 11 U.S.C. § 1193(b), the requirement of 11 U.S.C. § 1129(a)(10) that at least one impaired class has voted to accept a plan of reorganization is not applicable under Subchapter V, so long as the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under the plan and has not accepted the plan.

(a) The Plan is fair and equitable with respect to holders of general unsecured claims.

As shown in the Five-Year Projections attached to the Plan as Exhibit 2, the disposable income of debtor that is projected to be received in the five-year period beginning on the date that the first payment is due under the Plan will be distributed to holders of allowed general unsecured claims. The Plan furthermore provides appropriate remedies to protect holders of claims in the event that the payments due under the Plan are not made. Thus, the Plan is fair and equitable to Classes 4, 5, and 6 as required under 11 U.S.C. §1191(c)(2)(A).

(b) The Plan meets the requirements of §1129(b)(2)A).

A total of eleven classes of secured claims are treated in the Plan. (Class 2 and Classes 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10). The Plan provides that the holders of secured claims retain the liens securing such claims, whether the property subject to such liens is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such claims. The Plan furthermore provides that each holder of a secured claim receive on account of such claim deferred cash payments totaling the allowed amount of the claims, bearing interest at the rate of 10.5% per annum.

As for Class 3.4, Debtor has entered into an agreement with secured creditor Community Trust Bank ("CTB"), [ECF No. 238], which is incorporated hereto by reference, and pursuant to which CBT is recognized as having an allowed secured claim in the amount of $98,890.49 on account of Claims Nos. 8, 9 and 10, which is to be paid in conformity with §1129(b)(2)(A) as set forth in Section 4.03 of the Plan.

The Plan is fair and equitable all classes of secured claims, and thereby complies with 11 U.S.C. §1191(c)(2)(A).

**(11)     Feasibility of the Plan. 11 U.S.C. § 1129(a)(11).**

Based on the record, the Court finds that the Plan complies with 11 U.S.C. § 1129(a)(11).

**(12)      Payment of Bankruptcy Fees (11 U.S.C. § 1129(a)(12)).**

Pursuant to 11 U.S.C. § 1930(a)(6)(A), no U.S. Trustee fees are payable in this case. Subchapter V trustee fees are to be paid as of the Effective date of the Plan. The Plan therefore complies with 11 U.S.C. § 1129(a)(12).

**(13)      <u>Retiree Benefits (11 U.S.C. § 1129(a)(13)).</u>**

The Debtor is not obligated to provide retiree benefits; therefore, 11 U.S.C. § 1129(a)(13) is not applicable herein.

**(14)      Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).**

The Debtor is not required by a judicial or administrative order or by statute to pay domestic support obligations; therefore, 11 U.S.C. § 1129(a)(14) is not applicable herein.

**(15)      Individual Debtors (11 U.S.C. § 1129(a)(15)).**

Pursuant to 11 U.S.C. § 1181(a), 11 U.S.C. § 1129(a)(15) is not applicable herein.

**(16)      Transfers of Property (11 U.S.C. § 1129(a)(16)).**

The Debtor is a limited liability company and any transfers that are to be made pursuant to the Plan shall be made by motion and subject to the approval of the Court.

**D.  Principal Purpose of Plan (11 U.S.C. § 1129(d)).**

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933. The principal purpose of the Plan is to allow the Debtor to reorganize and continue its normal operations, and to maximize recoveries to all parties in interest in an orderly fashion, while also avoiding disruption and liquidation. Thus, the Court finds that Plan does not violate 11 U.S.C. § 1129(d).

**E.  Assumption and Rejection of Executory Contracts and Leases.**

Debtor has not assumed any executory contracts or unexpired leases under the Plan, but continues to operate out of its principal place of business located at 390 Bluesky Parkway, Lexington KY 40509.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (L) and (O). The Debtor was and is qualified to be a debtor under 11 U.S.C. § 109(a). Venue in the Eastern District of Kentucky was proper as of the Petition Date and continues to be proper under 28 U.S.C. § 1408.

2. As set forth above, the Plan complies in all respects with the applicable requirements of 11 U.S.C. § 1129(a), § 1229(b) and § 1191(b), and the Debtor has met its burden of proof for confirmation of the Plan.

3.  Pursuant to <u>Article V</u> of the Plan, Michael Wheatley, the Subchapter V Trustee, is appointed as the Trustee and Possession as of the date of this order.

4.  Pursuant to <u>Article V</u> of the Plan, Michael E. Wheatley, the Subchapter V Trustee, is appointed as the Disbursement Agent for the reorganized debtor.

5.  The Stipulation and Agreed Order of Debtor and the Internal Revenue Service Resolving the IRS's Objection to the Plan, [ECf No. 245], is hereby incorporated hereto as if fully set forth hereunder.

6.  The Stipulation and Agreed Order of Debtor and the Community Trust Bank, Inc. Regarding Treatment Under Plan of Reorganization, [ECf No. 238], are hereby incorporated hereto as if fully set forth hereunder.

## ORDER OF CONFIRMATION

7.  The Plan affixed hereto is incorporated herein and confirmed pursuant to 11 U.S.C. § 1191(b). The Plan and this order shall have the force and effect of a final judgment entered by this Court.

8.  The Effective Date of the Plan is as defined in <u>Section 6.06</u> of the Plan.

9.  Debtor shall make payments in an amount equal to any disposable income actually received in the five-year period beginning on the first payment is due under the Plan.

10. Debtor shall be discharged from any debt or claim that arose before confirmation of this Plan on the date upon which all payments due under the Plan have been made. The discharge of all debts shall not discharge any claims in connection with post-petition services of accountants, attorneys, trustees, or other professionals who agreed not to be paid on the Effective Date.

11. Notwithstanding the entry of this order or the occurrence of the Effective Date, this Court shall retain jurisdiction over this case to the extent permitted by law.

12. Pursuant to the Bankruptcy Rules 2002(f)(7) and 3020(c), the Debtor shall file and serve a notice of the entry of this Order and of the Effective Date of the Plan on all creditors and parties in interest within seven (7) days of the date of the entry hereof.

Tendered by:

*/s/ J. Christian Dennery*
J. Christian A. Dennery, Esq.
DENNERY, PLLC
7310 Turfway Rd, Ste 550
Florence, KY 41042
(859) 692-3685
cm@dennerypllc.com
Counsel for Debtor

**SO ORDERED,**

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*__Gregory R. Schaaf__*
**Bankruptcy Judge**
**Dated: Monday, December 16, 2024**
**(grs)**

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | | |
|---|---|---|
| In re | ) | Case No. 24-50346 |
| Fast Flow Plumbing, LLC | ) | Chapter 11 Subchapter V |
| Debtor | ) | Small Business Case |
| | ) | Hon. Gregory R. Schaaf |
| | ) | United State Bankruptcy Judge |

**FAST FLOW PLUMBING, LLC's**
**AMENDED CHAPTER 11 SUBHCAPTER V PLAN OF REORGANIZATION**
**Dated: December 10, 2024**

Fast Flow Plumbing, LLC ("Debtor, "debtor in possession," "the reorganized debtor," "Fast Flow, or "the "company"), by and through counsel, and pursuant to 11 U.S.C. §§1189 and 1193, hereby submits its Chapter 11 Subchapter V Plan of Reorganization (the "Plan").

**PLEASE TAKE NOTICE:** Your rights may be affected by the terms and conditions set forth in the Plan. You should read this Plan carefully and discuss it with your attorney.  If you do not have an attorney, you may wish to consult one. Electronic copies of the Plan are available upon request or can be accessed from the pacer.gov website.

*/s/ J. Christian A. Dennery*
J. Christian A. Dennery, Esq. (KBA 95878)
Dennery, PLLC
7310 Turfway Rd, Suite 550
Florence, KY 41042
Ph 859-692-3685
Fx 859-286-6726
jcdennery@dennerypllc.com

# TABLE OF CONTENTS

**Article 1.   Plan Summary.** .................................................................................... **1**

    Section 1.01   Creditor Prospectus and Liquidation Analysis.......................................... 1

    Section 1.02   Fast Flow Plumbing, LLC .......................................................................... 1

    Section 1.03   Business History............................................................................................. 2

    Section 1.04   Business Assets. ............................................................................................. 2

    Section 1.05   Business Loans. .............................................................................................. 3

    Section 1.06   Vendors. ......................................................................................................... 3

    Section 1.07   Events Leading to Bankruptcy ...................................................................... 3

    Section 1.08   Summary of Classification. ........................................................................... 4

    Section 1.09   Disbursements and Distributions. ................................................................. 4

    Section 1.10   Plan Implementation. .................................................................................... 4

    Section 1.11   Requirements of Confirmation. ..................................................................... 5

    Section 1.12   Voting. ........................................................................................................... 5

**Article 2.   Claims.** ................................................................................................... **5**

    Section 2.01   Allowed Claims. ............................................................................................ 5

    Section 2.02   Objections to Claims. .................................................................................... 5

    Section 2.03   Disputed, Contingent, and Unliquidated Claims........................................... 5

    Section 2.04   Claim Estimates and Compromises................................................................ 6

**Article 3.   Unclassified Claims; Priority Taxes; Administrative Claims.** ........................ **6**

    Section 3.01   Priority Tax Claims. ...................................................................................... 6

    Section 3.02   Administrative Claims.................................................................................... 6

**Article 4.   Classified Claims – Classification and Treatment.** ...................................... **7**

    Section 4.01   Class 1 – Administrative Convenience Classes ............................................ 7

    Section 4.02   Class 2 –1111(b)(2) Claim. ........................................................................... 8

    Section 4.03   Class 3 – Secured Creditor Classes. ............................................................. 10

    Section 4.04   Class 4 – Disputed, Contingent and Unliquidated Classes. ....................... 13

    Section 4.05   Class 5 – Guaranteed Claims. ...................................................................... 14

    Section 4.06   Class 6 – General Unsecured Claims. .......................................................... 15

    Section 4.07   Insider Claim. ............................................................................................... 15

**Article 5.   Plan Disbursements And Distributions** ..................................................... **16**

    Section 5.01   The Disbursement Fund. .............................................................................. 16

    Section 5.02   Appointment of Disbursement Agent. .......................................................... 16

    Section 5.03   Class 3 Deposits and Payments..................................................................... 17

    Section 5.04   Deposits, Disbursements and Distributions; §1191(b)............................... 17

**Article 6.     Implementation** ................................................................ **17**

    Section 6.01   Trustee in Possession. ................................................. 18

    Section 6.02   Fast Flow Plumbing, LLC Management. .................................. 19

    Section 6.03   Plan Funding; Sources and Uses. ....................................... 21

    Section 6.04   Operational Controls; Bookkeeping. ..................................... 22

    Section 6.05   The Reorganization Plan. ................................................. 23

    Section 6.06   The Effective Date. ........................................................ 23

    Section 6.07   Plan Duration and Timing. ................................................ 23

    Section 6.08   Vesting of Property of the Estate; Causes of Action. .................. 24

    Section 6.09   Assumption and Rejection of Executory Contracts. .................... 24

    Section 6.10   Discharge. ................................................................... 25

**Article 7.     Feasibility and Liquidation Analysis** ................................. **25**

    Section 7.01   Feasibility and Contingencies. .......................................... 25

    Section 7.02   Liquidation. ................................................................. 25

**Article 8.     Voting.** ..................................................................... **26**

**Article 9.     Defaults and Opportunity to Cure** ................................... **26**

    Section 9.01   Default Notice. ............................................................. 26

    Section 9.02   Opportunity to Cure. ...................................................... 26

    Section 9.03   Treatment of Uncured Default of Plan. ................................. 26

**Article 10.   General Provisions and Disclaimers.** ................................. **27**

    Section 10.01   Disclaimers ................................................................ 27

    Section 10.02   Definitions and Rules of Construction. ................................ 27

    Section 10.03   Captions. ................................................................... 27

    Section 10.04   Severability ................................................................ 28

    Section 10.05   Binding Effect. ............................................................ 28

    Section 10.06   Controlling Effect. ........................................................ 28


EXHIBIT 1 – CLAIMS AND CLASSIFICATION; CLASS 3 TREATMENT
EXHIBIT 2 – §1191(b) – FIVE-YEAR PROJECTIONS
EXHIBIT 3 – §1191(b) – CASH FLOW PROJECTIONS
EXHIBIT 4 – LIQUIDATION ANALYSIS

**DEBTOR FAST FLOW PLUMBING LLC'S CHAPTER 11 SUBHCPATER V PLAN OF
REORGANIZATION**

## Article 1.    PLAN SUMMARY.

This document constitutes Debtor's plan of reorganization submitted pursuant to §§1189, 1191, 1193(a) of Title 11 of the U.S. Code (the "Plan"). Among other things, this Plan describes: (1) the Debtor; (2) the events leading to the bankruptcy filing; and (3) the approach that Debtor believes will allow it to successfully reorganize. The Plan furthermore: (1) discusses how the Debtor proposes to treat the various claims; (2) addresses the factors that the Court must consider to determine whether or not the Plan should be confirmed; (3) assesses the feasibility of the Plan; and (4) compares what holders of allowed general unsecured claims stand to recover under the Plan with what such claimants would receive if the company were to be liquidated under chapter 7 of the Bankruptcy Code (the "Code").

Section 1.01    Creditor Prospectus and Liquidation Analysis.

Debtor proposes a five-year plan during which it estimates paying a combination of regular and periodic distributions on account of: (a) deferred payments to Administrative Claimants; (b) deferred cash payments to holders of secured claims in an amount equal to the value of the allowed portion of such claims as of the Effective Date (defined in Section 6.06 below); and (c) distributions to allowed general unsecured claims in accordance with Article 4 and Article 5 below.

(a) *Confirmation under §1191(b).* Debtor has requested confirmation under §1191(b). Debtor estimates that confirmation under §1191(b) will result in a delay of distributions to holders of allowed general unsecured claims until such time as all disputed, contingent or unliquidated claims treated in Class 5 and Class 6 are resolved or liquidated pursuant to a final order. Debtor expects that it would not be able to increase sales or its operational capacity under a plan confirmed under §1191(b). Holders of allowed general unsecured claims are projected to recover 23% of the face value of their claims. (See Exhibit 3).

(b) *Liquidation Analysis.* A liquidation analysis is attached hereto as Exhibit 4 and more fully discussed in Section 7.02 below. After payments on account of secured claims, priority tax and administrative claims, holders of allowed general unsecured claims would receive not more than $81,554.92, or about 8.5% of allowed general unsecured claims, if the case had been filed under chapter 7 of the Code.

Section 1.02    Fast Flow Plumbing, LLC

Fast Flow Plumbing, LLC is a privately held company organized under the laws of the commonwealth of Kentucky. The company's principal place of business is located at 390 Blue Sky Pkwy, Lexington, KY 40509. The company continues to operate its business pursuant to §§1107 and 1108 of the Code.

1

<u>Section 1.03</u>    <u>Business History.</u>

1.      Fast Flow began servicing customers in February 2018. Fast Flow provides a variety of plumbing services to homeowners throughout central Kentucky. The vast majority of revenues is generated from home services, although the company has the capacity to handle commercial clients, including commercial and residential real estate developers.

2.      Fast Flow's annual revenues grew quickly to $1.4M within the first year of operations. Company revenues remained steady at about $1.6M through 2020 to January 2021. By 2022, annual revenues had grown to $3.9M. In 2023, monthly revenues peaked at about $400K in July. After accounting for a steep drop in the last quarter of 2023, gross sales for 2023 are estimated to land at around $4M.

3.      Fast Flow's growth is a direct result of aggressive marketing, and sales initiatives disseminated through a combination of television ads, digital search engine optimization services, and pay-per-click campaigns. Fast Flow's ad spend represents about 10-12% of its gross revenues. In 2022, the company spent about $450K in marketing and advertisement. In the highly competitive marketplace for home services, allowances for marketing and advertising are crucial to the company's viability

4.      The company currently leases two locations, one in Lexington, under a commercial lease with about four years remaining in the term. The second location is in Somerset KY, under a month-to-month lease.

5.      The company experiences a high employee turnover rate and must devote significant resources to hiring and retaining staff.

6.      Fast Flow's payroll fluctuates in proportion to its revenues. Fast Flow currently employs about 19 full-time employees, including management, and is paying an average of $24K per week in payroll and payroll related expenses and liabilities. Donald Allen Fitzpatrick, Donald Fitzpatrick's son, is a salaried employee and an insider. Terry Tudor, Mr. Fitzpatrick's brother-in-law, and Marisa Ginter, Mr. Fitzpatrick's daughter-in-law are also insiders.

<u>Section 1.04</u>    <u>Business Assets.</u>

7.      Fast Flow's tangible assets are comprised of vehicles, field equipment, plumbing specific equipment, and hand tools. Excluding vehicles, the company estimates the replacement value of all of its tangible assets to equal not more than $245,750.00, most of which is pledged as collateral to secured lenders Western Equipment Finance and Allegiant Partners or held under a lease with Kubota Credit.

8.      Fast Flow owns approximately 24 vehicles, some of which are inoperable. Of the functional vehicles, 16 are encumbered by title liens held by various secured lenders including Ally Bank, Community Trust Bank, First Citizens Bank, M&T Bank, Toyota Commercial Finance, and Mercedes-Benz Financial.

9.      Fast Flow also utilizes vehicles and equipment that is titled in the name of Donald Fitzpatrick, some of which are encumbered by liens.

10.    About 10 vehicles are service vehicles driven by technicians who generate most of the revenues for the company. Each service vehicle can generate anywhere from $30K- 40K per month for the company.

11.    Fast Flow believes that most of the value of the company lies in the revenues of the ongoing concern which result directly from effective marketing, operational know-how, and the goodwill developed with the company's customer base since the opening of the business.

Section 1.05    Business Loans.

12.    During the pandemic, the company operations were supported by a $90K Payroll Protection Program Loan ("PPP Loan"), which was obtained in 2020, and later forgiven.

13.    Fast Flow also obtained two Economic Injury Disaster Loans from the US Small Business Administration, ("SBA"). One in the amount of $250K, which was disbursed in May 2020 ("EIDL No. 1"); The second in the amount of $250K, which was disbursed in the 3rd or 4th quarter of 2021. ("EIDL No. 2").

14.    The EIDLs are secured by a UCC all asset lien filed with the Kentucky Secretary of State on May 19, 2020.

Section 1.06    Vendors.

15.    Since its opening, Fast Flow has been procuring much of its materials from Master Plumbing Supply and has accumulated a significant trade debt with the wholesaler. Understandably, Master Plumbing Supply is no longer willing to sell to the company on terms. Without the ability to purchase materials from a wholesaler, Fast flow's material costs have gone up significantly, and the company has had to resort to buying materials at retail prices from outlets such as Home Depot.

16.    Re-establishing a normal course of dealing and payment terms with a plumbing supply vendor is a key to the successful reorganization in that it would allow the company to reduce its costs significantly and dispense with the many credit and other transactions by technicians who are routinely purchase materials at various retail outlets.

17.    Fast Flow has established itself in the home service industry primarily by the use of television ads and digital pay per click campaigns. Since the filing of the petition, Fast Flow has been able to reestablish a proper course of dealing with one television outlet and has begun producing television advertisements that have already resulted in an increase of revenues.

Section 1.07    Events Leading to Bankruptcy

18.    Since 2018, Fast Flow has expanded its capacity and supported its growth through a variety of financing activities.

19.    Day-to-day expenses were financed by a business line of credit with American Express, which has a current balance of about $115K. The company also accepted funding from various merchant cash advance companies, including Flash Funding, LLC, Velocity Capital, and Rocket Capital. ("MCA Lenders"). After accounting for inflated penalties, interests, and other fees, the MCA Lenders' claims amount to $769,315.83. in the aggregate.

20.    Starting in the Q3 of 2023, sales decreased considerably as a result of the loss of two key commissioned employees. An unprofitable commercial contract tied up the company's resources, which furthermore stifled the company's capacity to attract and service new and existing customers.

21.    The steep discount rates offered by the MCA lenders to purchase the company's future receivables, combined with the high rates of repayment, battered the company's cash flow. Fast Flow fell behind and had to cut back on marketing expenses, which has had an immediate impact on sales. Monthly sales were down to about $189K in February 2024 from a peak of $400K in July of the prior year.

22.    The company fell behind on payments to its major vendors, which impaired the marketing efforts and increased the company's costs of materials. Fast Flow also fell behind on most of its vehicle loans. Just prior to the filing of the petition, three service vehicles were repossessed by lenders.

23.    On March 26, 2024, Fast Flow filed for protection under chapter 11 of the US Bankruptcy Code. Two more service vehicles were repossessed after the petition, pursuant to a judgment lien against the company and the individual owners.

24.    On April 29, 2024, Donald Fitzpatrick and Ashley Fitzpatrick filed a chapter 11 petition to recover the vehicles.  (Case No. 24-50512-grs).

**Plan Summary**

Section 1.08    Summary of Classification.

This Plan provides for: two administrative convenience classes; 11 classes of secured creditors; six classes of general unsecured claims; and one class of insider claims. Recipients of this Plan are encouraged to review Article 4 below, together with the classification scheme set forth in Exhibit 1, for more information about the treatment of each class under this Plan.

Section 1.09    Disbursements and Distributions.

Except as otherwise provided, funds that are to be disbursed or distributed under this Plan shall be transferred to a Disbursement Fund, which is to be administered by a Disbursement Agent in accordance with Article 5 below.

Section 1.10    Plan Implementation.

To implement its Plan, Debtor intends to: (a) retain property of the estate; (b) modify its revenue/cost model to increase its competitiveness and profitability; and (c) expand its operational

capacity and sales through the implementation of operational controls, organizational development and aggressive marketing. The reorganized debtor intends to finance the cost of the reorganization with post-confirmation income. The implementation of the Plan is more fully discussed in <u>Article 6</u> below.

Section 1.11    Requirements of Confirmation.

To be confirmed by the Court, a plan in a case under chapter 11 must, among other things: (a) comply with the provisions of the Code; (b) have been proposed in good faith and not by any means forbidden by law; (c) propose to pay each holder of a claim, who has not accepted the Plan, property that is at least equal in value to what such holder would receive if Debtor's assets were liquidated in a case under chapter 7; (d) propose to pay all administrative claims in full; and (e) propose to pay all priority claims in full with deferred payments or cash. In addition, any agreement to include post-petition credit or to sell securities in connection with the Plan must be approved by the Court. The requirements for confirmation as they relate to this Plan are more fully discussed throughout this Plan.

Section 1.12    Voting.

Each holder of an allowed claim that is impaired under this Plan is entitled to vote to accept or to reject the Plan. After the Plan is filed, the Court will schedule a hearing on confirmation and prescribe the procedures that Debtor must follow to solicit votes. In a subchapter V case, such as the case at bar, confirmation of the Plan can be ordered under §1191(a), in the case of a consensual plan, and under §1191(b) in the case where an insufficient number of ballots have been cast to accept the Plan. The voting procedures and their effect on the confirmation of the Plan are more fully discussed in <u>Article 8 below</u>.

**Article 2.    CLAIMS.**

Section 2.01    Allowed Claims.

Unless an objection to a claim is filed, a claim is allowed if it is timely filed as a proof of claim and/or listed in debtor's schedules and not designated as contingent, disputed or unliquidated. A claim is deemed allowed in the amount set forth in the debtor's schedules or related proof of claim. Debtor makes no representations as to the validity or the amount of any claim scheduled of filed, and holders of claims should not presume that Debtor will not object to any claim even where such claims were not scheduled in Debtor's petition as being disputed, unliquidated, or contingent.

Section 2.02    Objections to Claims.

Objections to claims must be filed within ninety days (90) days from the Effective Date (defined in <u>Section 6.06</u> below), or Thirty (30) days after an amended claim is filed, whichever is later.

Section 2.03    Disputed, Contingent, and Unliquidated Claims.

For the purposes of this Plan:

(a) A "<u>disputed claim</u>" is a claim that has not been allowed or disallowed by a final and appealable order, and as to which: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of Claim has been filed, and the Debtor has scheduled such Claim as disputed, contingent, or unliquidated. Disputed Claims are included in and treated under Class 4.

(b) An "<u>unliquidated and/or contingent claim</u>" shall mean a claim that: (i) is not capable of ascertainment by reference to an agreement or by simple computation; or (ii) is based on liability that remains uncertain and contingent on the occurrence of some future event; and (iii) which has not been allowed or disallowed.

<u>Section 2.04</u>   <u>Claim Estimates and Compromises.</u>

For the purpose of formulating a plan of reorganization, Debtor has estimated the value of certain claims that have not yet been allowed by a final order and that are disputed, unliquidated, and/or contingent. Subject to any required Court approval, Debtor shall have the power and authority to fix the amount of disputed, unliquidated and/or contingent claims on an interim or final basis through a compromise. All compromised claims shall be included in and treated under this Plan in the manner set forth in any related final order.

**Article 3.    UNCLASSIFIED CLAIMS; PRIORITY TAXES; ADMINISTRATIVE CLAIMS.**

<u>Section 3.01</u>   <u>Priority Tax Claims.</u>

Pursuant to §1123(a)(1), claims for administrative expenses and priority tax claims are not classified ("Unclassified Claims").

(a) *KY Department of Revenue*. Debtor owes $27,129.06 to KY Department of Revenue (the "KY DOR"), $20,969.62 of which is afforded priority under §507(a)(8). The Plan proposes to pay KY DOR 100% of its priority tax claim over 20 quarterly payments of $1,048.48 to be administered by the Disbursement Agent in accordance with <u>Article V below</u>. The $6,159.44 non-priority portion of the claim will be included in Class 6 and treated accordingly.

(b) *Internal Revenue Service*. The IRS has filed a proof of claim in this case. (Claim No.13-3, the "IRS Claim"). The IRS Claim shall be treated in accordance with the terms and conditions set forth in the Stipulation and Agreed Order of Debtor and IRS Resolving the IRS's Objection to the Plan. [ECF No. 245].

<u>Section 3.02</u>   <u>Administrative Claims.</u>

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which, subject to the court's approval, are allowed under §503 of the Code. Debtor estimates administrative claims will amount to about $65,000.00 through the Effective Date of the Plan, including:

(a) An estimated $52,000.00 to Dennery, PLLC for bankruptcy representation and the reimbursement of administrative expenses incurred during the pendency of this case;

(b) An estimated $7,150.00 to Michael Wheatly, the Subchapter V Trustee; and

(c) An estimated $5,000.00 for tax preparation and CPA services that will be required to complete Debtor's 2023 tax filings.

Subject to court approval of any applications to employ professionals and for compensation, holders of administrative claims shall be paid directly by the reorganized debtor upon the Effective Date of the Plan, or as otherwise agreed to by such claimants.

**Article 4.    CLASSIFIED CLAIMS – CLASSIFICATION AND TREATMENT.**

This Plan provides for: (a) three administrative convenience classes, Class 1.1; Class 1.2; and Class 1.3 (grouped under "Class 1"); (b) one class consisting of one secured creditor that has elected to be treated under §1111(b)(2), Class 2; (c) ten classes of secured claims Class 3.1; Class 3.2; Class 3.3; Class 3.4; Class 3.5; Class 3.6; Class 3.7; Class 3.8; Class 3.9; and Class 3.10), (grouped under "Class 3"); (d) four classes of general unsecured claims, including Class 4.1, Class 4.2, Class 5, and Class 6; and (e) one class of insider claims, Class 7.

<u>Section 4.01    Class 1 – Administrative Convenience Classes</u>

The classes grouped under Class 1 consist of general unsecured claims that are equal or reduced to $2,500.00 or less, and that are not related to or part of an otherwise secured claim. ("Class 1 Claims"). Debtor, in its business judgment, estimates that the effort and cost of administering payments to the holders of Class 1 Claims would outweigh any benefit that could be realized by the estate from making deferred payments to holders of Class 1 Claims over the duration of the Plan. Class 1 Claims are classified into three (3) separate classes of claims held by 3 different creditors. Unless otherwise expressly provided, all Class 1 Claims shall be treated as follows:

(a) *Allowed General Unsecured Claims*. Class 1 Claim shall be allowed in the amounts set forth hereunder on the Effective Date. Holders of Class 1 Claim shall be entitled to contest the reduction or the amount of any Class 1 Claim not later than 30 days after the Effective Date.

(b) *Disbursement*. Class 1 shall be paid in full on the later of 60 days from the Effective Date, or 30 days after the any contest about a Class 1 Claim is resolved by a final order of the court.

**CLASS 1.1.    46Solutions.**  Class 1.1. consists of  $2,478.11 claimed by 46Solutions for telecommunication services provided under a month-to-month contract that Debtor continues to use in the day-to-day operations of the business**.** (POC No. 35). Class 1 shall be paid in full within 60 days of the Effective Date. Class 3.1 is not impaired and shall not be entitled to vote to accept or to reject the Plan**.**

**CLASS 1.2.    Cellco Partnership**. Class 1.2 consists of the claim held by Cellco Partnership in the amount of  $11,477.58 (POC No. 25), reduced to $1,721.64 for the sake of administrative convenience, which Debtor estimates Class 1.2 would be entitled to receive under the Plan. Class 1.2 is impaired and shall be entitled to vote to accept or to reject the Plan**.**

**CLASS 1.3.   SummitPoint Insurance Co**. Class 1.3 consists of the claim held by SummitPoint Insurance Co in the amount of $6,837.00 (POC No. 33), reduced to $1,025.55, which Debtor estimates Class 1.3 would be entitled to receive under the Plan. Class 1.3 is impaired and shall be entitled to vote to accept or to reject the Plan**.**

Section 4.02    Class 2 –1111(b)(2) Claim.

Class 2 consists of the claim filed by Mercedes-Benz Financial Services, USA, LLC ("MBFS") (Claim No. 30; the "MBFS Claim"), incurred under purchase money loans secured by collateral that is being retained under this Plan, (the "Retained Collateral"), said loans being cross collateralized against a 2023 Mercedes-Benz GLS450, and a 2019 Mercedes-Benz Sprinter, which were surrendered prior to confirmation (together the "Surrendered Collateral"):

| Make and Model and Year | VIN |
|---|---|
| Mercedes-Benz M2CAE6 2020 | W1Y4ECHY0LT024800 |
| Mercedes-Benz M2CA76 2021 | W1Y4ECHYXMT060270 |
| Mercedes-Benz M2CA76 2019 | WD4PF1CD1KP035860 |

(a) *Adequate Protection Payments*. MBFS is entitled to adequate protection payments on account of the Retained Collateral, [ECF Nos. 112, and 166].

(b) *Treatment of §1111(b)(2) Claim.* Recognizing MBFS's election under §1111(b)(2) [ECF No. 178], and for the purposes of confirmation and plan treatment only: (i) the value of the Retained Collateral shall be fixed at $68,345.33, (the "Retained Collateral Value"); and (ii) MBFS's claim shall be fixed on an interim basis at $110,000.00, (the "Estimated §1111(b)(2) Claim"), which is calculated as: (i) the total MBFS Claim of $209,386.32; LESS (ii) $99,386.32 in estimated net proceeds from the sale of the surrendered equipment collateral.

(c) *Estimated Plan Payments.* Beginning on the 20th day of the first full calendar month following confirmation, Debtor shall make equal monthly principal and interest payments on account of the Estimated §1111(b)(2) Claim equal to $1,833.33 (calculated as the Retained Collateral Value and bearing interest at the rate of 20.59% per annum over a five-year term). The Estimated §1111(b)(2) Claim and plan payments will be adjusted to reflect the actual proceeds net of the costs of sale realized by MBFS from the sale of the Surrendered Collateral, beginning with the first plan payment due 30 days after the sale of any surrendered equipment, with any deficiency added to the Estimated §1111(b)(2) Claim and paid on a straight-line amortization basis over the remaining months in the plan term. MBFS agrees to use commercially reasonable efforts to sell the Surrendered Collateral no later than 60 days from the effective date. In the event the Surrendered Collateral is not sold within the 60-day period, MBFS will report the status of sale efforts to Debtor, and Debtor reserves the right to seek relief from the bankruptcy court.

(d) *Application of Sale Proceeds and Adjustment of Initial Plan Payments.* Application of Sale Proceeds and Adjustment of Initial Plan Payments. The proceeds of the sale of the

Surrendered Collateral and post-petition adequate protection payments shall be applied to reduce the total MBFS Claim of $209,386.32.

(e) *Disbursements.* All payments due under this Section shall be administered by the Disbursement Agent as provided in Article 5 below.

(f) *Reservation of Rights to Sell Collateral.* Subject to §363(k), Debtor reserves the right to sell the Retained Collateral, free and clear of MBFS's lien with the proceeds of any such sale to be paid directly to MBFS as satisfaction of its allowed claim, provided that: (i) such sale is a bona fide, third-party arms-length transaction; and (ii) MBFS is given no less than 21 days actual advance notice of such sale by email to sgrow@wnj.com, EVonEitzen@wnj.com and fwbankruptcyteam@mercedes-benz.com. Debtor's notice of intent to sell shall include the identity of the buyer, the purchase price, and a description of the condition of the equipment to be sold, including mileage, maintenance or repairs made to the equipment within the past 12 months, and such other information as MBFS may reasonably request. MBFS shall have not more than ten (10) business days from the date of Debtor's notice to consent to the sale or exercise its right to credit bid

(g) *Retention of Lien.* MBFS shall retain the lien securing its allowed claim. Except as expressly modified by this Plan, the Debtor shall perform all of its obligations under the pre-petition loan agreements between Debtor and MBFS (the "Loan Agreements") which are expressly reaffirmed and shall remain binding. Debtor expressly warrants that Debtor will: (i) maintain all policies of insurance covering the Retained Collateral and immediately deliver to MBFS any notice of cancellation, revocation, or nonrenewal received by Debtor in connection with any such policy; (ii) keep the Retained Collateral in good working order and repair and perform all scheduled and preventative maintenance on the Retained Collateral; and (iii) deliver to MBFS, at MBFS' request, such records or documents evidencing MBFS' performance of its obligations as MBFS may reasonably request, including insurance binders and certificates, maintenance logs, and other records.

(h) *Release of Lien.* Upon the payment in full of the Class 2 Claim, MBFS shall release the lien encumbering any property of Debtor.

(i) *Default.* If Debtor fails to timely make any monthly payment or otherwise breaches any term of the Loan Agreement or the terms of this Plan, including failure to maintain insurance or to maintain the Retained Collateral in good working order (each a "Breach"), then any bar, injunction or stay applicable to MBFS, including any injunction under Section 524, shall immediately terminate and MBFS shall have the right to immediately repossess the Retained Collateral and exercise any and all rights and remedies under the Loan Agreements and applicable law without further Order of this Court on 10 days written notice to Debtor unless the Debtor cures such Breach and provides evidence satisfactory to MBFS that Debtor has fully and completely cured such Breach within such 10-day notice period. Email notice to J. Christian Dennery at jcdennery@dennerypllc.com and mwheatleytr@gmail.com   shall be sufficient to meet the notice requirements in this Section.

The dismissal or conversion of this Bankruptcy Case, or the filing of another bankruptcy proceeding shall also constitute a default. Upon dismissal, conversion, or the filing of a subsequent bankruptcy case, MBFS shall have the unilateral and immediate right, in its sole discretion, to revoke the treatment of MBFS' secured claims under the Plan and reinstate the Loan Agreements, including the pre-petition loan terms and payment amounts, without notice nor the need for any further Court order.

(j)    *Impairment*. Class 2 is impaired and shall be entitled to vote to accept or to reject the Plan.

Section 4.03    Class 3 – Secured Creditor Classes.

The classes grouped under Class 3 are comprised of 19 secured claims, with an aggregate value of $1,380,234.22, that are secured against property of the estate, including the company's furniture, fixtures, field equipment and vehicles that Debtor intends to retain and use over the course of the Plan. Claims are furthermore classified into ten (10) groups of claims held by 10 different secured creditors. (Class 3.1; Class 3.2; Class 3.3; Class 3.4; Class 3.5; Class 3.6; Class 3.7; Class 3.8; Class 3.9; and Class 3.10), (Collectively "Class 3 Claims"). Unless otherwise expressly provided, all Class 3 Claims shall be treated as follows:

(a)    *Allowed Secured Claims*. Without waiving any rights to object to any claim or the valuation of the related collateral as provided for in Section 2.02 above, and except as otherwise provided in this section, Debtor assumes that a total of $863,853.76 (Exhibit 1, pp. 1-2) is secured against property of the estate, and that the difference of $516,909.37 is unsecured and to be treated in Class 6 in accordance with Section 4.06 below.

(b)    *Adequate Protection Payments*. Pursuant to cash collateral orders issued by the Court [ECF Nos. 44, 60, 81, and 108], (the "Cash Collateral Orders"); and the various agreed order for adequate protection payments with (i) Community Trust Bank, [ECF No. 72]; (ii) Western Equipment Finance, [ECF No. 129]; (iii) Toyota Commercial Finance Inc. [ECF No. 153]; and (iv) First Citizen Bank and Trust Company [EF No. 165], ("Agreed Orders"), Debtor shall continue to segregated for the benefit of, or make adequate payments directly to, secured creditors through the Effective Date, which Debtor has calculated at $59,916.71.

(c)    *Present Value of Secured Claims.* The present value of each Class 3 Claim shall be calculated as the secured amount of the claim LESS any adequate protection payments made on account of such claim through the Effective Date of the Plan as shown in Exhibit 1, p. 2. Any party contesting the present value of the property that secures a Class 3 Claim shall be required to do so within 60 days after the Effective Date. Adjustments to the present value of any contested Class 3 Claim shall be finalized 90 days after the Effective Date, or 30 days after the entry of a final order on any related contest, whichever occurs later. The deferred payments due on account of an adjusted Claim 3 Claim shall be adjusted proportionately.

(d)    *Deferred Payments*. Unless otherwise expressly provided for, the reorganized debtor shall make 60 equal monthly interest and principal payments to holders of allowed Class 3 Claims equal to the present value of the allowed Class 3 Claim bearing interest at the rate of 10.50% per annum (Exhibit 1, p. 2). Monthly payments shall be made by the

10

Disbursement Agent as provided in <u>Article 5</u> below beginning on the 20th day of the first calendar month following the Effective Date.

(e) *Retention of Lien*. Holders of Class 3 Claims shall retain all liens securing their claims, whether the property subject to such lien is retained by Debtor or transferred to another entity, to the extent of the allowed amount of the secured claim.

(f) *Reservation of Rights to Sell Collateral*. Subject to §363(k), Debtor reserves the right to sell any collateral subject to a lien securing a Class 3 Claim, free and clear of such lien with such lien attaching to the proceeds of any sale or transfer, which shall be paid over to the holder a related allowed Class 3 Claim in accordance with this section.

(g) *Release of Lien*. Holders of any Class 3 Claim that are fully paid shall release any lien on the property securing the claim, whether the property subject to any such lien is retained by Debtor or transferred to another entity.

**CLASS 3.1.    First Citizens Bank & Trust.** Class 3.1. is comprised of the secured claims held by First Citizens Bank & Trust (POC Nos. 1, 2, and 34), in the total amount of $151,376.32 (the "Class 3.1 Claims"). Subject to any later adjustments, and after accounting for adequate protection payments to be made through the Effective Date, the present value of the Class 3.1 Claims shall be fixed as $144,261.32. First Citizen shall be entitled to monthly principal and interest payments of $3,100.74, beginning on the 20th day of the first calendar month following the Effective Date until the Class 3.1 Claims are paid in full. The unsecured portion of Class 3.1 Claims, if any, shall be treated in Class 6 in accordance with <u>Section 4.06</u> below**.** Class 3.1 is impaired and shall be entitled to vote to accept or to reject the Plan.

**CLASS 3.2.    Allegiant Partners.** Class 3.2. consists of the secured claim filed by Allegiant Partners (POC No. 6), in the total amount of $27,411.74 (the "Class 3.2 Claim"). Subject to any later adjustments, and after accounting for adequate protection payments to be made through the Effective Date, the present value of the Class 3.2 Claims shall be fixed as $25,964.05. Allegiant Partners shall be entitled to monthly principal and interest payments of  $558.07, beginning on the 20th day of the first calendar month following the Effective Date, until the Class 3.2 Claim is paid in full. The unsecured portion of the Class 3.2 Claim, in the estimated amount of $411.74, shall be treated in Class 6 in accordance with <u>Section 4.06</u> below**.** Class 3.2 is impaired and shall be entitled to vote to accept or to reject the Plan.

**CLASS 3.3.    Toyota Industries Commercial Finance Inc.** Class 3.3. consists of the secured claim filed by Toyota Industries Commercial Finance Inc. (POC No. 7), in the total amount of $225,560.99 (the "Class 3.3 Claim"). Subject to any later adjustments, and after accounting for adequate protection payments to be made through the Effective Date, the present value of the Class 3.3 Claims shall be fixed as $210,767.29. Toyota Industries Commercial Finance, Inc. shall be entitled to monthly principal and interest payments of $4,530.21, beginning on the 20th day of the first calendar month following the Effective Date, until the Class 3.3 Claim is paid in full. The unsecured portion of Class 3.3 Claim, if any, shall be treated in Class 6 in accordance with <u>Section 4.06</u> below**.** Class 3.3 is impaired and shall be entitled to vote to accept or to reject the Plan.

**CLASS 3.4.     Community Trust Bank Inc.** Class 3.4. is comprised of the secured claims filed by Community Trust Bank Inc (POC Nos. 8, 9, and 10; the "Class 3.4 Claims"). The present value of the Class 3.4 Claims shall be fixed as $98,890.50 as of October 31, 2024. Community Trust Bank shall be entitled to monthly principal and interest payments of $2,125.54, beginning on the 20th day of the first calendar month following the Effective Date, until the Class 3.4 Claims are paid in full. All mother amounts due in connection with the Class 3.4 Claims are allowed in the estimated amount of $24,048.65 and shall be treated in Class 6 in accordance with <u>Section 4.06</u> below**.** Class 3.4 is impaired and shall be entitled to vote to accept or to reject the Plan.

**CLASS 3.5.     The Huntington National Bank.** Class 3.5. consists of the secured claim filed by The Huntington Bank (POC No. 6), in the total amount of $27,981.45 (the "Class 3.5 Claim"). Subject to any later adjustments, and after accounting for adequate protection payments to be made through the Effective Date, the present value of the Class 3.5 Claims shall be fixed at $26,907.85. The Huntington Bank shall be entitled to monthly principal and interest payments of $578.35, beginning on the 20th day of the first calendar month following the Effective Date, until the Class 3.5 Claim is paid in full. The unsecured portion of Class 3.5 Claim, if any, shall be treated in Class 6 in accordance with <u>Section 4.06</u> below**.** Class 3.5 is impaired and shall be entitled to vote to accept or to reject the Plan.

**CLASS 3.6.     Ally Bank.** Class 3.6. is comprised of the secured claims filed by Ally Bank (POC Nos. 15, and 23), in the total amount of $88,156.74 (the "Class 3.6 Claims"). Subject to any later adjustments, and after accounting for adequate protection payments to be made through the Effective Date, the present value of the Class 3.6 Claims shall be fixed at $63,636.72. Ally Bank shall be entitled to monthly principal and interest payments of $1,367.80, beginning on the 20th day of the first calendar month following the Effective Date, until the Class 3.6 Claims are paid in full. The unsecured portion of the Class 3.6 Claims, in the estimated amount of $19,331.74, shall be treated in Class 6 in accordance with <u>Section 4.06</u> below**.** Class 3.6 is impaired and shall be entitled to vote to accept or to reject the Plan.

**CLASS 3.7.     M & T Bank.** Class 3.7. consists of the secured claim filed by M & T Bank (POC No. 16), in the total amount of $44,208.72 (the "Class 3.7 Claim"). "). Subject to any later adjustments, and after accounting for adequate protection payments to be made through the Effective Date, the present value of the Class 3.7 Claims shall be fixed at $31,661.72. M & T Bank shall be entitled to monthly principal and interest payments of $680.53, beginning on the 20th day of the first calendar month following the Effective Date, until the Class 3.7 Claim is paid in full. The unsecured portion of the Class 3.7 Claim, in the estimated amount of $11,283.72, shall be treated in Class 6 in accordance with <u>Section 4.06</u> below**.** Class 3.7 is impaired and shall be entitled to vote to accept or to reject the Plan.

**CLASS 3.8.    U.S. Small Business Administration**. Class 3.8 consists of Claim No. 17, filed by the U.S. Small Business Administration (the "SBA"), in the amount of $536,835.14 (the "SBA Claim"), on account of a promissory note made under the Economic Injury Disaster Loan program administered by the SBA (the "EIDL Note"), which was perfected by the filing a UCC-1 Financing Statement with the office of the KY Secretary of State. (The "SBA Lien"). The SBA Claim is secured against Debtor's tangible and intangible assets prior to the commencement of the case. Pursuant to §552(a), property acquired by the estate or by the debtor after the commencement of the case is not subject to the SBA Lien, except for proceeds from the sale of that property. Debtor estimates the value of the assets that it could sell, use, or lease and that are subject to the SBA Lien to be not more $72,750.00, including $52,750.00 in tangible assets, and $20,000.00 in parts inventory that is periodically used in the ordinary course of Debtor's business. The SBA Claim shall be allowed as a secured claim in the amount of $72,750.00 (the "Class 3.8 Claim"). Subject to any later adjustments, and after accounting for adequate protection payments to be made through the Effective Date, the present value of the Class 3.8 Claim shall be fixed at $57,014.00. The SBA shall be entitled to monthly principal and interest payments of $1,225.45, beginning on the 20th day of the first calendar month following the Effective Date, until the Class 3.8 Claim is paid in full. The unsecured portion of the Class 3.8 Claim, in the estimated amount of $464,085.14, shall be treated in accordance with Section 4.07 below.  Class 3.8 is impaired and shall be entitled to vote to accept or to reject the Plan.

**CLASS 3.9.    Kubota Credit Corporation.** Class 3.9. is comprised of the secured claims filed by Kubota Credit Corporation (POC Nos. 18, 19, 20, and 22), in the total amount of $86,696.71(the "Class 3.9 Claims"). Subject to any later adjustments, and after accounting for adequate protection payments to be made through the Effective Date, the present value of the Class 3.9 Claims shall be fixed as $72,444.43. Kubota Credit Corporation shall be entitled to monthly principal and interest payments of $1,557.11, beginning on the 20th day of the first calendar month following the Effective Date, until the Class 3.9 Claims are paid in full. The unsecured portion of the Class 3.9 Claims, in the estimated amount of $11,361.81, shall be treated in Class 6 in accordance with Section 4.06 below**.**  Class 3.9 is impaired and shall be entitled to vote to accept or to reject the Plan.

**CLASS 3.10.    Western Equipment Finance.** Class 3.10. is comprised of the secured claims filed by Kubota Credit Corporation (POC Nos. 26, and 27), in the total amount of $81,610.14 (the "Class 3.10 Claims").  After accounting for adequate protection payments to be made through the Effective Date, the present value of the Class 3.10 Claims shall be fixed as $72,389.18. Western Equipment Finance shall be entitled to monthly principal and interest payments of  $1,555.93, beginning on the 20th day of the first calendar month following the Effective Date, until the Class 3.10 Claims are paid in full. The unsecured portion of the Class 3.10 Claim, in the estimated amount of $2,905.38, shall be treated in Class 6 in accordance with Section 4.06 below**.**  Class 3.10 is impaired and shall be entitled to vote to accept or to reject the Plan.

Section 4.04    Class 4 – Disputed, Contingent and Unliquidated Classes.

The classes grouped under Class 4 consist of two claims against the Debtor that are disputed, contingent, and unliquidated, because the claims are subject of threatened litigation or pending

litigation, (the "Class 4 Claims"). Unless otherwise expressly provided, all Class 4 Claims shall be entitled to receive, in accordance with <u>Article 5</u> below, quarterly distributions of their prorata share of Debtor's disposable income beginning on the 20th day of the first calendar quarter following the allowance or disallowance of the last Class 4 Claim that has not been allowed or disallowed.

**CLASS 4.1.    The Barker Claim.** Class 4.1 consists of the Claim filed by Joseph Barker (Claim No. 24) in the amount of $400,000.00, which is the subject of threatened litigation in Clark County Kentucky, the basis for which is strongly disputed by Debtor. The amount of the Class 4.1 is contingent on the outcome of litigation The Class 4.1 Claim shall be valued at $0.00 until Mr. Barker obtains a judgment, or otherwise liquidates his claim against the estate. Mr. Barker shall have 60 days from the Effective Date to pursue his cause of action against Debtor or forever be barred from receiving distributions under the Plan. Class 4.1 is impaired and entitled to vote to accept or to reject the Plan.

**CLASS 4.2.    The Lush Claim**. Class 4.2 consists of the Claim filed by Charles Lush & Kimberly Lush, after the bar date (Claim 36; the "Lush Claim") in the amount of $22,750.00, which is the subject of pending litigation in Fayette County Kentucky, (Case No. 24-CI-1460), the basis for which is strongly disputed by Debtor. The amount of the Class 4.2 is contingent on the outcome of litigation. The Class 4.2 Claim shall be valued at $0.00 until the Lushes obtains a judgment, or otherwise liquidate their claim against the estate. The Lushes shall have 60 days from the Effective Date to pursue their claims against Debtor or forever be barred from receiving distributions under the Plan. Class 4.2 is impaired and entitled to vote to accept or to reject the Plan.

<u>Section 4.05</u>    <u>Class 5 – Guaranteed Claims</u>.

Class 5 is comprised of $491,284.15 in claims filed by Rocket Capital (Claim No. 5), and Flash Funding (Claim No. 31) which were scheduled in Debtor's petition as disputed, contingent, or unliquidated, and which are personally guaranteed by Donald A. Fitzpatrick and/or Ashley Fitzpatrick. ("Class 5 Claims").

(a) *Disallowed Claims*. A claim in the amount of $278,031.68 held by Velocity Capital Group Settlement and a claim in the amount of $17,000.00 held by Chase United were scheduled by Debtor as being disputed, contingent and/or unliquidated, and are disallowed due to the claimant's failure to timely file a proof of claim. No distributions shall be made in connection with these claims.

(b) *Delayed Distributions*. Holders of Class 5 Claims shall not receive any distributions under this Plan unless and until all Class 5 Claims are allowed or disallowed by operation of §502(a), this Plan, and/or pursuant to a final appealable order.

(c) *Treatment and Distributions.* Holders of allowed Class 5 Claims shall be entitled to receive, in accordance with <u>Article 5</u> below, quarterly distributions of their prorata share of Debtor's disposable income beginning on the 20th day of the first calendar quarter following the allowance or disallowance of the last of the Class 5 Claims that has not been allowed or disallowed.

(d) *Impairment*. Class 5 is impaired and allowed claims shall be entitled to vote to accept or to reject the Plan.

Section 4.06   Class 6 – General Unsecured Claims.

Class 6 is comprised of nonpriority general unsecured claims: (a) that were scheduled in Debtor's petition, and/or filed as a proof of claim, and not scheduled as disputed, contingent, or unliquidated in Debtor's schedules; and (b) in an amount equal to the unsecured portion of any Class 3 Claims (Collectively "Class 6 Claims").

(a) *Allowed General Unsecured Claims*. Without waving any rights to object to any Class 6 Claim, and for the sole purpose of developing conservative projections, Debtor assumes that $431,088.96 in Class 6 Claims shall be allowable pursuant to §502(a) of the Code, by a final order, and/or as otherwise provided for under this Plan.

(b) *Treatment and Distributions.* Holders of allowed Class 6 Claims shall be entitled to receive, in accordance with Article 5 below, quarterly distributions of their prorata share of Debtor's disposable income beginning on the 20th day of the first calendar quarter following the allowance or disallowance of the last Class 6 Claim that has not been allowed or disallowed.

(c) *Impairment*. Class 3 is impaired, and holders of an allowed Class 3 Claim are entitled to vote to accept or to reject the Plan.

Section 4.07   Insider Claim.

Donald Fitzpatrick and Ashley L Fitzpatrick each own a 50% interest in Fast Flow Plumbing, LLC, and are deemed "insiders" as that term is defined in §101(31) of the Code. Both Fitzpatricks personally guaranteed the Debtor's business debts. The pair have filed a proof of claim in the amount of $500,000.00 (Claim No. 32). The claim is an estimate of the Fitzpatrick's personal liability in connection with business debts that may not be repaid by Debtor under this Plan, and therefore is unliquidated and contingent. (The "Fitzpatrick Claim"). (See Exhibit 1). The Fitzpatrick Claim is a general unsecured claim and is classified under Class 7 of this Plan.

(a) Allowance of Claims. The Fitzpatrick Claim shall be allowed to the extent of any personal liability incurred in connection with business debt that remains owing by and enforceable against the Fitzpatricks (jointly or severally), on the day that the final payment due to other holders of allowed claims under this Plan is made.

(b) Rights to Distributions. The Fitzpatrick shall be entitled to apply any Distributable Cash to the payment of holders of Class 5 Claims, only after the final payment under the Plan is made to Class 1, 2, 3, 4, 5, and 6, and only to the extent of any balance remaining on Class 5 Claims personally guaranteed by the Fitzpatricks. Any Payments to holders of Class 7 Claims shall be monitored and administered by the Disbursement Agent as provided in Article 5 below.

(c) <u>Impairment</u>. Class 7 is impaired, and the Fitzpatricks are entitled to vote to accept or to reject this Plan. However, any vote cast by the Fitzpatricks shall not be counted toward the acceptance of the Plan because they are insiders.

## Article 5.   PLAN DISBURSEMENTS AND DISTRIBUTIONS

<u>Section 5.01    The Disbursement Fund</u>.

Debtor in possession has elected to establish a disbursement fund into which shall be transferred any amounts due under the Plan to holders of administrative claims and of allowed claims. (the "Disbursement Fund").

<u>Section 5.02    Appointment of Disbursement Agent</u>.

Upon confirmation, Micheal Wheatley, the Subchapter V Trustee, shall be appointed as the Disbursement Agent. The Disbursement Agent shall be charged with the management of the Disbursement Fund in accordance with this Article, with any requirements for a fidelity bond being waived.

(a) *Duties of the Disbursement Agent*. The Disbursement Agent shall administer funds to be deposited into the Disbursement Fund and the distributions that are due in accordance with the terms of this Plan. All funds coming into the Disbursement Fund shall be held in a separate bank account used solely for that purpose.

(b) *Monitoring*. The Debtor, the U.S. Trustee and any creditor with an allowed claim may monitor the Disbursement Fund and the distributions made by the Disbursement Agent. Upon request, the Disbursement Agent shall make available to the U.S. Trustee and any creditor with an allowed claim all receipts, books, account statements, reports, or records related to the Disbursement Fund within a reasonable time after receiving a request for such information.

(c) *Compensation and Reimbursement of Disbursement Agent*. The Disbursement Agent shall be compensated on an hourly basis or in an amount equal to 5% of the amounts deposited into the Disbursement Fund, whichever is less, PLUS the necessary and actual out-of-pocket expenses incurred in connection with the administration of the Disbursement Fund, including but not limited to wire transfer fees, electronic payment fees, and/or printing and postage costs, ("Disbursement Fees"). Compensation to the Disbursement Agent and the reimbursement of Disbursement Fees shall have priority over any other disbursements, distributions or payments to be made under the Plan from the Disbursement Fund.

(d) *Removal of Disbursement Agent*. The reorganized debtor, any Creditor, the U.S. Trustee, or any party in interest shall have the right, after notice and a hearing, to remove and replace the Disbursement Agent for cause. Any successor thereof shall be appointed by the Court subject to bonding requirements, if any are imposed by the Court.

Section 5.03    Class 3 Deposits and Payments.

Beginning on the 10th day of the first calendar month following the Effective Date, and for 59 months thereafter, Debtor shall deposit into the Disbursement Fund the monthly payments due to holders of Class 2 Claims and Class 3 Claims, plus any related Disbursement Fees. The Disbursement Agent shall review and produce a check register and/or prepare checks, and ensure that payments are transmitted directly to each holder of an allowed Class 2 or Class 3 Claim so that such holder receives the payment by the 20th day of each month in accordance with Article 5 above.

Section 5.04    Deposits, Disbursements and Distributions; §1191(b).

(a) *Disposable Income*. The term "Disposable Income" shall mean income that is actually received by Debtor, which is not reasonably necessary to be expended for the payment of expenditures necessary for the continuation, preservation and operation of the business of the debtor, after accounting for: (1) Disbursement Fees; (2) allowed administrative claims and expense reimbursements entitled to administrative priority pursuant to §503(b) and/or §507(a); and (3) payments due to holders of Class 1, Class 2 and Class 3 Claims.

(i) Deposits of Disposable Income. Beginning on the 10th day of the first month following the confirmation date, Debtor shall make monthly deposits into the Disbursement Fund of any Disposable Income, plus any Disbursement Fees.

(ii) Distributions of Disposable Income. On the M20th day of the first calendar quarter following the date that the last Class 4, Class 5, and Class 6 Claim that was not allowed is allowed or disallowed by a final and appealable order, holders of allowed Class 4, Class 5, and Class 6 Claims ("Allowed GUCs"), shall be entitled to an initial distribution of their prorata share of the funds on deposit in the Disbursement Fund (the "Initial Disbursement of Disposable Income").

(iii) Quarterly Distributions. Beginning on the 20th day of the first calendar quarter immediately following the Initial Disbursement of Disposable Income, the Disbursement Agent shall begin making quarterly payments of Disposable Income to Allowed GUCs prorata on a claim basis through the end of the Plan.

(b) Forfeiture; Unclaimed Distributions. All unclaimed Minimum Distributions or Periodic Distributions shall revert to the reorganized debtor after forty-five days of issuance by the Disbursement Agent and shall be forfeited as to the affected creditor. Any creditor who forfeits a distribution will thereafter be treated as having a disallowed claim.

## Article 6.    IMPLEMENTATION.

To implement the Plan, Debtor intends to: (a) modify its management structure; (b) retain property of the estate; (c) modify its operational model to increase its competitiveness; and (d) expand its marketing efforts. The reorganized debtor intends to finance the Plan with operating income and recoveries achieved through settlements or otherwise.

<u>Section 6.01</u>    <u>Trustee in Possession.</u>

(a) *Trustee in Possession.* Upon confirmation, Fast Flow Plumbing, LLC shall be removed as the debtor-in-possession, and Michael E. Wheatley, the Subchapter V Trustee, shall perform or cause to be performed the duties of a trustee in possession, (hereinafter the "TIP"), pursuant to 11 U.S.C. § 1183(b), including but not limited to:

   (i)    selling or surrendering assets;

   (ii)    establishing manager and officer salaries and bonus structures;

   (iii)    approving the selection of any consultants, advisors, or third-party contract services;

   (iv)    hiring, replacing, or terminating officers, managers, employees, consultants, and/or third-party contract services;

   (v)    initiating and controlling all litigation, specifically including litigation to be brought under chapter 5 of the Bankruptcy Code;

   (vi)    implementing whatever accounting safeguards necessary and appropriate to implement the Plan, including the opening and closing of any deposit accounts.

(b) *Semi Annual Reporting*. The TIP shall file semi-annual reports to the Court concerning Fast Flow's income and expenses, the beginning and ending balance of the Disbursement Fund established by the Plan, and all payments made pursuant to this Plan.

(c) *TIP Compensation Procedures*. The TIP shall be compensated in accordance with the following procedures:

   (i)    Notwithstanding any provision to the contrary, the approval of any compensation due to the TIP shall remain subject to 11 U.S.C. § 330(a), Bankruptcy Rule 2016(a), and Local Bankruptcy Rule 2016-1.

   (ii)    On or before the twentieth (20th) day of each month following the month for which compensation is sought, the TIP shall serve a monthly statement of the compensation sought on: (A) the Debtor; (B) counsel for the Debtor; (C) counsel for the Office of the United States Trustee; and (D) anyone one else that the court may designate. (a "the Monthly TIP Statement").

   (iii)    Any Monthly TIP Statement shall set forth the period covered by the statement, a list of any individuals who provided services during the statement period, their respective billing rates, the aggregate hours spent by each individual, a reasonably detailed description of the services delivered, any expenses incurred, and contemporaneously maintained time entries for each individual in increments of tenths (1/10) of an hour.

   (iv)    Any party entitled to receive a Monthly TIP Statement shall have 14 days from receipt of the Statement to object to the amounts requested (the "Objection Deadline"), by serving a written objection on the TIP and all recipients of the statement, that specifies fees and/or expenses fees with which the objecting party takes issue, and which specifies the nature of the objection and the amount of the fees or expenses at issue.

(v)    Notwithstanding an objection, at the expiration of the Objection Deadline, Debtor shall: (A) segregated 100% of the fees requested in the Monthly TIP Statement for the benefit of the TIP; and (B) promptly pay the TIP eighty (80%) of the fees requested in the statement and one hundred percent (100%) of any reimbursed expenses to which no objection has been made.

(vi)    The TIP shall file interim applications for compensation not less than twice per year. Within 21 days from the filing of an application of compensation, any objections to the TIP Statement that were not previously resolved shall be formally submitted to the Court and set for a hearing by the objecting party.

(vii)    Within 14 days of an order approving the related interim or final application for compensation, the Debtor shall pay the balance of any fees or expenses that are approved by a final order of the Court and that were held back in accordance with these procedures.

(viii)    Within 14 days of the entry of an order denying all or part of the TIP's application for compensation, the TIP shall be required to refund the Debtor any fees or expenses paid but not approved by a final order of the Court.

(ix)    In the event that the compensation procedures are not followed by the TIP, the TIP: (A) shall become ineligible to receive further monthly payments of fees or expenses as provided herein absent a further order of the Court; and (B) may be required to disgorge any fees paid since the last fee application was approved.

(d)  *Construction; Compensation Procedures*.

(i)    The pendency of an objection to an application for compensation, or a court order denying the payment of compensation or reimbursement of expense as to any particular TIP Statement shall not disqualify the TIP from future payments of compensation or reimbursement of expenses, unless otherwise ordered by the Court.

(ii)    Neither the payment of, nor the failure to pay, in whole or in part, monthly compensation and reimbursements as provided herein shall have any effect on any interim or final order authorizing compensation to the TIP, or the reimbursement of expenses of any professionals.

(iii)    Nothing in these procedures shall be construed as excusing the TIP from filing applications to employ any professional persons in accordance with 11 U.S.C. § 327.

<u>Section 6.02</u>   <u>Fast Flow Plumbing, LLC Management.</u>

(a)  *Insiders*. Donald Anthony Fitzpatrick and Ashley Fitzpatrick, the 50% owners of the company are husband and wife. Donald Allen Fitzpatrick is Mr. Fitzpatrick's adult son and works in the field for the company. Terry W. Tudor, the sales manager, is Mr. Fitzpatrick's son-in-law.

(b)  *Change in Executive Authority*. Mr. Fitzpatrick has stepped down as the chief executive officer to focus solely on marketing and the development of the Fast Flow organization. Jennifer Hurst, a long-time employee of the company and a seasoned operator in the plumbing business will be promoted to chief executive officer. Ms. Hurst will be

accountable for the implementation and for the management and operations of the reorganized debtor in accordance with the Chapter 11 plan. Subject to the authority of the TIP, Ms. Hurst shall be in control of all day-today decision-making for a period of not less than one year from the Effective Date, unless she resigns or is replaced.

(c) *Change in Management of Marketing and Sales*. Ashley Fitzpatrick has worked on and off with the company in an administrative capacity. After a prepetition hiatus from the company, Ashley resumed work as a marketing manager sometime in July 2024. Ms. Fitzpatrick has elected to recuse herself from any management or administrative role within the company going forward. The company has decided to hire an independent marketing agency to manage and implement all sales and marketing initiatives and to strictly control the marketing and advertising budgets for the company. Mr. Fitzpatrick shall continue to function as the chief marketing officer for Fast Flow. In conjunction with the third-party agency, and subject to the authority of the TIP, Mr. Fitzpatrick shall be responsible for developing and overseeing marketing campaigns. The cost of the third-party marketing agency is factored into the marketing expenses set forth in the Debtor's projections (Exhibit 2).

(d) *Organizational Development*. The company experiences a high rate of employee turnover and must devote significant resources to hiring, training and retaining staff. The company believes that it can stabilize employee turnover and build a positive corporate culture through apprenticeship and leadership development programs. Subject to the authority of the TIP, Mr. Fitzpatrick shall be responsible for implementing staff and organizational development initiatives. Mr. Fitzpatrick is uniquely suited for this work as the only Master Plumber employed by the company, an avid student of personal and organizational development, in addition to being recently ordained as a minister.

(e) *Other Staff*. The reorganized debtor intends on retaining, or replacing from time to time, its existing salaried or commissioned employees, technicians and office staff. Fast Flow intends to supplement its existing staff at rates of pay that are commensurate with industry standards. The increase in revenues, and any expansion of the company's payroll are factored in projections. Exhibit 2.

(f) *Management Consultants & Advisors*. Fast Flow recognizes that it will require ongoing help from various consultants to reorganize. Subject to the authority of the TIP, Consultants will be retained from time to time to organize and keep the company books, implement and deploy digital applications, and advise on and implement efficiency protocols. The costs of consultants and advisors are factored in the projections. Exhibit 2.

(g) *Retention and compensation of professionals*. Aside from bankruptcy counsel, Fast Flow is not presently working with any professionals. Debtor has filed an extension of time to file its 2023 tax return and will need to hire an accountant to complete the tax filings. Debtor shall submit applications to retain any professionals for any services as required by §§327(a), 328, 330, and 331 of the Bankruptcy Code. Debtor has accounted for $10,000.00 in accounting fees, although it believes that the cost will be much less.

(h) *Retention and compensation of Disbursement Agent*. Upon confirmation, the reorganized debtor intends to retain the Disbursement Agent to assist with the implementation of the Plan without the need for further applications or orders. See <u>Section 5.02(c)</u> above.

(i) *Cooperation with TIP*. Debtor, its officers, managers, and employees, shall be required to fully cooperate with the TIP in the discharge of his duties as those set forth in <u>Section 6.01</u> above  and 11 U.S.C. § 1183(b).

<u>Section 6.03</u>    <u>Plan Funding; Sources and Uses</u>.

The Plan will be funded through the reorganized debtor's operating income, recoveries or awards obtained through litigation or compromises as shown below.

(a) *Operating Income*. The large majority of the distributions to be made under the Plan will be funded by operating income. Debtor projects that $1.9M in operating income will fund the payment of administrative expenses, payments to secured lenders, leaving an estimated about $220K in projected disposable income and $177K as a cushion available for distributions, or which could protect against any operating contingencies. (<u>Exhibit 3</u>).

**Section 1191(b)**

| SOURCES | | USES | |
|---|---:|---|---:|
| Estimated Cash (Effective date) | $ 47,134 | | |
| Estate Recoveries | $ 40,552 | Admin. Claims (Eff. Date) | $ 59,311 |
| Projected Operating Income | $ 1,846,591 | Est. TIP Fees | $ 132,000 |
| **Total Sources** | **$1,934,277** | Class 1 | $ 5,225 |
| | | Class 2 | $ 158,172 |
| | | Class 3 | $1,036,785 |
| | | Capital Expenses/Reserves | $ 100,000 |
| | | Est. Disbursement Agent Fees | $ 45,000 |
| | | Misc. Disbursement Expenses | $ 3,000 |
| | | Projected Disposable Income | $ 217,696 |
| | | Cushion/Contingency Reserve | $ 177,088 |
| | | **Estimated Uses** | **$1,934,277** |

(b) *Recoveries*. Debtor expects to recover an as of yet undetermined amount from its former CPA for accounting fees paid for work that was never performed. Debtor furthermore expects to recover $36,000.00 from Donald Fitzpatrick and $4,435.00 from Ashley Fitzpatrick for post-petition pay and other expenses that were not approved under court. Debtor is continuing to investigate whether additional causes of action or counterclaims could be brought against various parties. Debtor has listed the potential causes of action in <u>Section 6.08</u> below. Any amounts recovered shall be preserved for the benefit of the estate as shown in <u>Exhibit 3</u>.

(c) *Sale of Assets*. Subject to §363(k), and/or any applicable non-bankruptcy law, Debtor reserves the right to sell any collateral subject to a lien, free and clear of such lien with

such lien attaching to the proceeds of any sale or transfer and being paid in deferred payments in accordance with the treatment provided to Class 3. Any sale of the collateral shall be finalized not later than one year from the Effective Date. Debtor has not accounted for any proceeds from the sale of any assets in this Plan.

(d) *Obtaining Post Petition Credit*. Although this Plan does not contemplate additional debt, nothing in this Plan shall be construed as Debtor's waiver of its right to solicit or obtain credit in the ordinary course of its business, or outside of the ordinary course of business: (i) with priority over any or all administrative expenses of the kind specified in §§503(b) or 507(b); (ii) secured by a lien on property of the estate that is not otherwise subject to a lien; or (iii) secured by a junior lien on property of the estate that is subject to a lien.

Section 6.04    Operational Controls; Bookkeeping.

In the absence of up-to-date bookkeeping records, the company has not been able to get a complete picture of the company's financial performance and consequently was not able to effectively budget. With some effort, Debtor has been able to reconstitute and analyze its expense accounts for the period beginning on April 1, 2024, through July 31, 2024. The analysis indicates that payroll, the company's cost of materials, and the marketing budgets must be controlled in order for the company to successfully reorganize. Subject to TIP Approval and oversight, the reorganized debtor shall implement operational controls, including without limitation:

(a) *Bookkeeping Service*. A third-party bookkeeping service shall be employed to reconcile and maintain the company books and enable management to produce real-time reports that allow for constant monitoring of company performance and costs.

(b) *Budgeting and Cash Management*. The TIP shall implement a schedule for all deposits of funds, check runs and payroll routines and shall monitor all expenditures and key performance indicators on a weekly, monthly and quarterly basis. The TIP shall have authority to approve budgets, forecasts, and the issuance of checks. The CEO shall be the sole authorized signatory for the company accounts and the sole person with a debit card to the operating accounts.

(c) *Materials Cost Control*. Management will be charged with compiling and maintaining a materials costing system to ensure accuracy in pricing and job estimates.

(d) *Performance-based Management Compensation*. Salaries for the three company managers, Donald A. Fitzpatrick, Jennifer Hurst, and Terry Tudor, shall be established at the annual rate of $80,000.00. All managers shall be entitled to a share of the lesser of 3% of gross revenues or $10,000.00 for any month when: (i) gross revenues are equal to or exceed $250,000.00, AND (ii) total payroll costs, including management bonuses are equal or less than 39% of gross revenues for that same month. The payment of any Management bonuses shall be monitored and approved by the TIP and paid one month in arrears. The TIP shall review and modify the schedule of management bonuses as is necessary and appropriate in its discretion.

(e) *Performance-based Employee Compensation*. The TIP, in conjunction with management, shall review and establish a schedule of compensation for all commission-based

technicians. In addition to any commissions due, the TIP in his sole discretion may authorize the payment of bonuses to commissioned-based technicians when: (i) as of yet determined performance metrics is satisfied, AND (ii) total payroll costs, including commissioned-based technician bonuses are equal or less than 39% of gross revenues for that same month, after accounting for management bonuses. The TIP may provide for bonuses for other wage earners if total payroll costs, after accounting for all bonuses, are equal to or less than 39% of gross revenues. Technician and wage earners bonuses shall be reviewed by The TIP and paid one month in arrears.

Section 6.05    The Reorganization Plan.

The Fast Flow brand has stood out in the marketplace in large part because of a focus on marketing and sales, competitive pricing, as well as prompt and superior customer service. The MCAs have depleted all funds that would have allowed the company to invest in advertising and to more aggressively market its services. The resulting drop in sales has wreaked havoc on the operations of the company and the company was not able to adjust quickly enough to stabilize its cash flow.

In order to build on its prior successes, Fast Flow has to reduce the debt owed to the MCAs and free up cash to launch marketing campaigns that would increase overall revenues and operating margins. The successful reorganization depends in large part on:

(a) Eliminating, reducing, and/or reorganizing the company's liabilities.

(b) Re-establishing terms and accounts with critical plumbing supply vendors to lower the costs of materials.

(c) Devoting 15% of its gross revenues to marketing and sales.

(d) Retaining a marketing agency to control the costs and increase the company's return on ad spend; and

(e) Hiring additional commissioned technicians to handle the expected increase in service requests.

Section 6.06    The Effective Date.

The Plan shall become effective as of the first day of the first calendar quarter falling after the confirmation of the Plan, unless a stay of the confirmation order is in effect on that date, in which case the effective date shall be the first day of the first calendar quarter after the date on which the stay of the confirmation order expires or is otherwise terminated. (Referred throughout as the "Effective Date").

Section 6.07    Plan Duration and Timing.

The Plan shall last for five (5) years, (or 20 quarters), from the Effective Date. All payments, disbursements, and distributions due under this Plan shall be made within five (5) years from the Effective Date. Any distributions that are proposed by the reorganized debtor to be made after the termination of the Plan shall not affect the duration of the Plan.

Section 6.08    Vesting of Property of the Estate; Causes of Action.

Except as provided in this section, the property of the estate as defined in §541 of the Code shall vest in the Debtor upon the completion of the Plan. Debtor hereby reserves the exclusive right to pursue any relief to which it may be entitled including without limitation, any cause of action: (a) arising under 542, 543, 544, 547, 548, 549, 550, or 553 of the Bankruptcy Code; or (b) for breach of contract, accounts payable or other commercial actions against customers or vendors; or (c) for intentional torts or negligence causing damage to the company. Upon confirmation, any cause of action or right of recovery existing before confirmation shall vest in Debtor. Specifically, Debtor reserves the right to bring an action or counterclaims against:

(a)  Baldwin CPAs under nonbankruptcy law causes of action for breach of contract, quasi contracts, and unjust enrichment, and/or §§544, and 548 as transferees of estate property prior to the petition date for less than the reasonably equivalent value.

(b)  Donald A. Fitzpatrick, Ashley L. Fitzpatrick under §§544, 547, and 548 as transferees of estate property prior to the petition date.

(c)  The estate of Donald A. Fitzpatrick, Ashley L. Fitzpatrick under §549 as a transferee of estate property after the petition date.

(d)  Velocity Capital Group, Rocket Capital NY LLC, Flash Funding, LLC under §§544, 547, and 548 as obligees of constructively fraudulent conveyances, and/or transferees of estate property prior to the petition date.

(e)  Hannah-Kate Williams for defamation and tortious interference with Debtor's contractual relationships and other causes of action related to her past employment with the company.

(f)  Joseph Barker for breach of contract, negligence, conversion and tortious interference with Debtor's contractual or commercial relationships and other causes of action related to his past employment with the company.

(g)  Charles Lush & Kimberly Lush for attorney fees, sanctions and other causes of actions related to the parties' contractual relationship and Case No. 24-CI-1460 brought in Fayette County, Kentucky.

Any cause of action not pursued within one year from the Effective Date shall be deemed abandoned without further order of the Court.

Section 6.09    Assumption and Rejection of Executory Contracts.

Except as otherwise provided for in this Plan or in a final order, the reorganized debtor shall be deemed to have rejected all pre-petition executory contracts and/or unexpired non-residential leases not expressly assumed through confirmation, or by way of a motion approved by a final court order. Any parties to a rejected executory contract or an unexpired non-residential lease shall file proof of a claim for breach damages arising out of a rejection under this section not later than thirty (30) days after the confirmation of the Plan.

24

(a) *Blue Sky Parkway.* Debtor has a leasehold interest in the commercial premises located at 390 Blue Sky Pkwy, Lexington, KY 40509 under non-residential lease with a certain Magnolia Enterprises, LLC. The lease is in good standing and has three and half years left before its natural termination. Debtor parks its vehicles and houses all parts and equipment at the premises. Debtor's central office is also housed at the location. Debtor will remain current on the lease but has elected not to formally assume the lease.

(b) *Somerset Location.* Debtor also leases non-residential premises at 11 Jesse Lane, Somerset, KY 42501, on a month-to-month basis. Debtor houses some parts and equipment at the Somerset location. Debtor services his southeastern Kentucky customers from that location. To the extent that the lease is assumable under §365(a), Debtor will remain current on the lease but has elected not to formally assume the lease.

Section 6.10   Discharge.

Debtor shall be discharged from any debt or claim that arose before confirmation of this Plan on the earlier of: (a) the date upon which all payments due under the Plan have been completed; or (b) the 5th anniversary of the Effective Date. The discharge of all debts shall not discharge any claims in connection with post-petition services of accountants, attorneys, trustees, or other professionals who have agreed not to be paid on the Effective Date of the Plan.

**Article 7.    FEASIBILITY AND LIQUIDATION ANALYSIS**

Section 7.01   Feasibility and Contingencies.

Debtor remains conscious that the occurrence of various operating contingencies could prevent Debtor from implementing the Plan as proposed herein. Nevertheless, the Projections incorporated into the Plan show that Debtor will be able to make all payments due under the Plan, remain cash flow positive and administratively solvent during the life of the Plan, and that the confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization. (See Exhibit 3).

Section 7.02   Liquidation.

Debtor's most valuable asset is Mr. Fitzpatrick's master plumbing license, without which Debtor would not be able to operate, as well as the goodwill nurtured in the Central and Southern Kentucky regions, which can only be monetized through its continued operation. Debtor estimates that as of the Effective Date, its tangible and current assets have an estimated value of $1,111,676.99. After accounting for a liquidation discount, the secured lenders, administrative expenses, and the costs of liquidation, Debtor expects that not more than $81,554.92, or 8.5% of allowed general unsecured claims included in Class 5, and Class 6, would be available for distributions. Exhibit 4. All creditors will receive or retain property of a value that is more than if Debtor was liquidated under a chapter 7.

**Article 8.**        **VOTING.**

(a) *Voting*. A debtor in possession must solicit and obtain votes accepting the plan before it can be confirmed. Holders of allowed claims or interests that are included in a class that is "impaired" by the plan are entitled to vote to accept or to reject the plan.

   (i) Impairment under §1124. A class of claims or interests is said to be impaired under a plan unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights of the holders in such class; or (2) reinstates the claims pursuant to their original terms and cures any default.

   (ii) Classes impaired under the plan. Classes 2, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 4.1, 4.2, 4.3, 5, 6, and 7 are impaired under this Plan. Each holder of an allowed claim included in the impaired classes is entitled to vote to accept or reject the Plan. Holders of claims to which an objection is filed or that are disallowed shall not be counted for the purposes of confirmation. Class 7 can vote to accept or to reject the plan, but it's vote will not be counted because the Fitzpatricks are insiders.

(b) *Not voting*. If any holder of a claim that is entitled to vote does not vote, the Plan may be confirmed or not confirmed without considering any votes that were not cast.

**Article 9.**        **DEFAULTS AND OPPORTUNITY TO CURE**

<u>Section 9.01</u>    <u>Default Notice.</u>

Subject to any orders entered in this case, any Claimant or other party in interest aggrieved by a material default under the provisions of this Plan, may provide written notice to the reorganized debtor and to the Subchapter V Trustee (a "Default Notice"). The Default Notice must describe with specificity the nature of the default alleged and the steps required to cure such default.

<u>Section 9.02</u>    <u>Opportunity to Cure.</u>

The reorganized debtor shall have thirty (30) days after receipt of a written Default Notice to cure such default. The aggrieved Claimant or party in interest shall take no further action until at least thirty (30) days have passed and the Debtor has not cured or substantially complied with the Default Notice. Even after the thirty-day period has expired, the reorganized debtor may cure a default at any time, even after an application or motion has been filed by an aggrieved party.

<u>Section 9.03</u>    <u>Treatment of Uncured Default of Plan</u>.

If the reorganized debtor defaults in its obligations under the Plan, and after the required notice and opportunity to cure, the default remains uncured, the aggrieved party may bring the matter before the Court, and the Court may thereafter order the Debtor to liquidate any available assets and disburse the proceeds as appropriate to pay the obligations under the Plan or provide such other relief at the Court's discretion.

**Article 10.**     **GENERAL PROVISIONS AND DISCLAIMERS.**

Section 10.01   Disclaimers

(a) **No warranties**: While every effort has been made to provide the most accurate information available, Fast Flow Plumbing, LLC is unable to warrant or represent that all information is without inaccuracy. Nor can Fast Flow Plumbing LLC undertake to warrant the absolute accuracy of any assumption regarding the prospective performance of the business as set forth in the financial statements or projections provided in these materials.

(b) **No Appraisals**. No formal appraisals have been undertaken of Fast Flow Plumbing, LLC's assets. The values placed thereon and used as assumptions hereunder are Fast Flow Plumbing, LLC's best estimate of the liquidation value of its assets as of the date of this Plan.

(c) **Estimated Claims and Financial Projections**. Debtor estimates the value of allowed claims as being equal to the face amount of any claim scheduled either in Debtor's schedules, or in claims filed by the holder thereof. These estimates and the related assumptions respecting related plan payments are made solely for the purpose of allowing Debtor to provide conservative financial projections and assess the feasibility of this Plan. Nothing in this Plan shall be construed as Debtor's waiver of its objection to any claim scheduled In Debtor's petition, provided for in this Plan, or filed as a proof of claim.

(d) **Tax Consequences**. Debtor is not qualified to advise creditors as to the specific tax ramifications of confirmation of the Plan, and therefore makes no representation in this regard. However, Debtor is not aware of any potential material federal tax consequences to creditors that would result from confirmation of the Plan. Each creditor is urged to consult with a tax advisor as to such matters. No material tax consequences to Debtor are anticipated as a result of confirmation of the Plan, or of the entry of an order discharging Debtors as such a discharge, reduction, or forgiveness of indebtedness would be exempt from gross income pursuant to IRC §108.

Section 10.02   Definitions and Rules of Construction.

The definitions and rules of construction set forth in §§101 and 102 of the Code shall apply when terms defined or construed under the Code are used in this Plan. Capitalized terms shall have the meaning assigned to them throughout the narrative of the Plan. The Exhibits attached hereto and referenced throughout are incorporated herein and shall be construed in a manner that is consistent with the terms of this Plan.

Section 10.03   Captions.

The headings contained in this Plan are for convenience of reference only and shall not affect the meaning or interpretation of this Plan.

Section 10.04  Severability.

If any provision in this Plan is determined to be unenforceable or inconsistent with the provisions of the Bankruptcy Code, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

Section 10.05  Binding Effect.

The rights and obligations of any entity named or referred to in this Plan as amended or modified, will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

Section 10.06  Controlling Effect.

Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Kentucky govern this Plan and any agreements, documents, and instruments executed in connection with this Plan. The Bankruptcy Court for the Eastern District of Kentucky shall retain subject matter jurisdiction over any disputes arising under this Plan.

Respectfully submitted,

*/s/Donald A. Fitzpatrick*
Fast Flow Plumbing, Inc.
Debtor and Debtor in Possession
By: Donald A. Fitzpatrick
Its: Corporate Representative
Dated: December 10, 2024

*/s/ J. Christian A. Dennery*
J. Christian A. Dennery, Esq. (KBA 98575)
Dennery, PLLC
7310 Turfway Rd, Suite 550
Florence, KY 41042
859-692-3685
jcdennery@dennerypllc.com
Attorney for debtor and debtor in possession
Dated: December 10, 2024